UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| REVEREND RONALD CHRISTIAN, TAMI CHRISTIAN, and EVERETTE CHRISTIAN, <br><br>            Plaintiffs, <br><br>   v. <br><br>HAMILTON JEWELERS, RED BANK POLICE DEPARTMENT, CAPTAIN DARREN MCCONNELL, JOHN/JANE DOES 1-10, CORPORATIONS ABC through XYZ, and BOROUGH OF RED BANK, <br><br>            Defendants. | HONORABLE JOSEPH E. IRENAS <br><br>CIVIL ACTION NO. 11-00518 (JEI/KMW) <br><br>**OPINION** |

**APPEARANCES:**

Cynthia Hardaway, Esq.
Military Park Building
60 Park Place
Suite 1602
Newark, NJ 07102
    Counsel for Plaintiffs Reverend Christian, Tami Christian, and Everette Christian

Thomas R. Ashley, Esq.
50 Park Place
Suite 1400
Newark, NJ 07102
    Counsel for Plaintiffs Reverend Christian, Tami Christian, and Everette Christian

```
CHAMLIN, ROSEN, ULIANO & WITHERINGTON, PC
John T. Bazzurro, Esq.
Charles John Uliano, Esq.
268 Norwood Avenue
PO Box 38
West Long Branch, NJ 07764
     Counsel for Defendants Red Bank Police Department, Captain
     Darren McConnell, and Borough of Red Bank


BYRNES O'HERN LLC
Daniel J. O'Hern, Jr., Esq.
28 Leroy Place
Red Bank, NJ 07701
     Counsel for Defendants Red Bank Police Department, Captain
     Darren McConnell, and Borough of Red Bank
```

**IRENAS**, Senior District Judge:

This § 1983 and state law torts matter, currently before

the Court on Defendants' motion for summary judgment, involves

the dissemination of a police notification informing surrounding

law enforcement agencies and related organizations of a report

of suspicious conduct at a local jewelry store.[1]  The

notification contained two of the Plaintiffs' DMV photos and

identifying information, referred to them as "subjects," and

informed recipients that although no crime was committed, it is

possible that the subjects "have committed a theft in other

jurisdictions or may be preparing to do so."  (Opp'n Br., Ex. M)

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C.
§ 1331, and exercises supplemental jurisdiction of Plaintiffs'
state law claims pursuant to 28 U.S.C. § 1367(a).

2

Plaintiffs, aggrieved by the miasma of criminality created by the message, argue Defendants' conduct was racially motivated, contrary to proper police procedure, and injured Plaintiffs' standing in their community.  Defendants argue that liability cannot attach because Defendants are protected by qualified immunity, and in any event Plaintiffs fail to prove the occurrence of a constitutional violation.

For the reasons outlined below, the Court will grant summary judgment in Defendants' favor.  While the United States Constitution, New Jersey common law, and New Jersey Law Against Discrimination clearly protect against racially motivated and unfounded allegations of criminality, the conduct of Defendants did not violate the law.

**I.**

On May 15, 2010, Plaintiff Reverend Ronald Christian and his wife Tami entered Hamilton Jewelers ("Hamilton") in Red Bank, New Jersey.[2]  (Pls.' Fact ¶ 1)[3]  From the moment they entered, they believed they were being stared at and followed because of their African-American race.  While Reverend

---

[2] Hamilton was formerly a defendant but was dismissed with prejudice November 7, 2013.  (Dkt. No. 96)

[3] The Courts refers to Plaintiffs' Statement of Material Facts with the citation "Pls.' Facts" and Defendants' Statement of Undisputed Material Facts with "Defs.' Facts."

Christian spoke on his cell phone, occasionally exiting and re-entering the store, Tami looked at jewelry and spoke with store employees.  (Pls.' Fact ¶ 1)  At one point the couple went upstairs to use the restroom.  (Pls.' Fact ¶ 6)  A sales associate followed them and waited outside.

The couple returned downstairs and Tami tried on a $6,000 watch.  (Pls.' Facts ¶¶ 1, 32)  Reverend Christian then told a store employee that they had to eat before buying anything, and the couple soon left the store.  (Pls.' Facts ¶ 33)  The entire visit lasted approximately one hour.[4]  (Pls.' Facts ¶ 1)

Minutes after Hamilton closed its doors for the day, the couple returned.  (Pls.' Facts ¶ 8)  Reverend Christian tried to enter, and after finding the front door locked, asked an employee through the closed door if he could check the restroom for his keys.  (Pls.' Facts ¶ 8)  The employee checked the restroom himself, did not find any keys, and refused the Christians entry.  (Pls.' Facts ¶ 8)  Reverend Christian then asked the owner of a neighboring store, referred to by the parties as "Anthony," if he could assist in gaining entry to Hamilton.  (Pls.' Facts ¶ 9)  Anthony's attempts were also rebuffed.

---

[4] Along with their opposition brief and supporting materials, Plaintiffs submitted a USB memory stick on which the relevant portions of Hamilton's video footage are saved.  The Court has reviewed the footage.

4

After the Christians left, a Hamilton employee called Defendant Red Bank Police Department (the "Department") and reported that a couple who had acted suspiciously while in the store had returned after closing and were refused entry. (Pls.' Facts ¶ 9)  The employee asked the Department if a police officer could escort the remaining employees to their cars. (Pls.' Facts ¶ 9)  Officer Hicks was quickly dispatched, escorted the employees to their cars, and wrote up an incident report. (Pls.' Facts ¶ 9)  Hicks included in his report the license plate number of the Christians' car, as reported by Hamilton employees. (Pls.' Facts ¶ 11)

Two weeks later, employees of non-party Mustillo's Bridal Boutique ("Mustillo's"), located on the same street as Hamilton, reported to the Department that an African-American couple had recently visited the store and acted in a suspicious manner. (Pls.' Facts ¶ 12)  Officer Hicks, who is himself African-American, again responded to the call, spoke with Mustillo's employees and wrote a report on his visit.  In his report, Officer Hicks noted that the incident "sound[s] similar to an incident that was reported [] at Hamilton Jewelers." (Defs.' Facts ¶ 10; Opp'n Br., Ex. F)

Defendant Captain Darren McConnell, director of the Department's Special Operations Bureau, read the two reports and decided to conduct an investigation. (Pls.' Facts ¶¶ 14, 28)

5

He visited Hamilton on June 2, 2010 and met with Johnny
Hillibrandt, a Hamilton employee who helped the Christians
during their visit.  Hillibrandt told McConnell that he did not
believe the couple was interested in buying a watch because they
were walking around looking at other items and repeatedly
wandered in and out of the store.  (Pls.' Facts ¶ 15)
Hillibrandt also told McConnell that Reverend Christian made
several vulgar statements and asked another sales associate if
she was afraid he was "going to steal something," thereby
strengthening Hillibrandt's suspicion.  (Pls.' Facts ¶¶ 15, 16)
McConnell and Hillibrandt also reviewed Hamilton's surveillance
tape from the day of the incident.  (Pls.' Facts ¶ 19)

Prior to visiting Hamilton, McConnell ran the license plate
number Officer Hicks included in his Hamilton incident report.
(Pls.' Fact ¶ 20)  After determining that Reverend Christian was
the registered owner of the car, McConnell ran Reverend
Christian's driver's license and printed a copy of his DMV
photo.  (Pls.' Fact ¶ 20)  McConnell also ran the vehicle's
license plate through the Department's Automated Traffic System
(ATS) to determine who else drove the vehicle.  (Pls.' Facts ¶
20)  ATS informed McConnell that Plaintiff Everette Christian,
Reverend Christian's sister, had previously received a summons
while operating the vehicle.  (Opp'n Br., Ex. H)  McConnell
subsequently printed her DMV photo.  (Pls.' Fact ¶20)

Captain McConnell took the photos with him when he visited Hamilton and showed them to Hillebrandt and Anthony, the neighboring proprietor. (Pls.' Facts ¶ 20; Defs.' Facts ¶ 14) Hillebrandt identified Reverend Christian as the male who had visited the store and stated he was fairly certain the Reverend's companion was Everette. (Pls.' Facts ¶ 21) Anthony was shown the same photos and stated that he was certain that the companion was Everette, but wasn't certain the male was Reverend Christian, yet he added it very well could be. (Pls.' Facts ¶ 21) McConnell, apparently under the assumption that Everette was with Reverend Christian at Hamilton, did not show Hillebrandt or Anthony a photo of anyone other than Reverend Christian and Everette.

McConnell returned to the station to write a supplemental report. (See Br., Ex. C) McConnell ran the Christians' names through the Department's Automated Criminal System (ACS) and learned that the Reverend had a prior shoplifting complaint filed against him and Everette had entries for "ordinance type violations" but no criminal entries. (Defs.' Fact ¶ 15; Pls.' Facts ¶ 22)

McConnell further determined, in light of height disparities between the relevant actors, that different couples visited Hamilton and Mustillo's. (Pls.' Facts ¶ 22)

7

On June 3, 2010, McConnell prepared a notification titled "Police Information" (the "Information") that he disseminated via email, fax, and New Jersey's Critical Reach System.[5]  The Information identified Reverend and Tami Christian by name, included their DMV photos, dates of birth, driver's license numbers, and home addresses, and stated that the Department "received a report of a suspicious incident involving two subjects possibly attempting to commit a distraction theft at a local jewelry store."  (Information, Br., Ex. F)  The Information then recounted the events of the day of the incident: the subjects "inquired about purchasing a Chanel watch for $6,000"; "[e]mployees immediately became suspicious"; "the subjects [] returned 10 minutes after store clos[ed]" and "attempted to have a nearby storeowner convince" the employees to open the store, "at one point claim[ing] to have left their keys in the store."  (Information, Br., Ex. F)

The Information concluded: "Although no crime occurred in this jurisdiction, this information is being relayed for information purposes as the actors could have committed a theft in other jurisdictions or may be preparing to do so.  Any

_____

[5] New Jersey's Critical Reach System is a secure network used by the state's law enforcement entities.  (Defs.' Facts ¶ 16) Plaintiffs assert that the Information was sent "to several non-law enforcements [sic] agencies, to include municipalities, jails, and organizations such as crime stoppers, which are made up of private citizens."  (Pls.' Facts ¶ 58)

8

department with information or inquiries contact Capt. Darren McConnell." (Information, Br., Ex. F)

Reverend Christian subsequently found a copy of the Information laying on his desk at his church.[6] (Pls.' Facts ¶ 35) It is unknown who left it there. (Pls.' Facts ¶ 35) He immediately faxed Everette a copy. (Pls.' Facts ¶ 38)

The Reverend called Captain McConnell on the number provided on the Information but does not recall reaching him. (Pls.' Facts ¶ 37) Soon thereafter, he faxed a letter to Captain McDunna of the Department, informing him that his sister Everette was not with him on the day in question and "seeking an[] immediate retraction" of the Information. (Opp'n Br., Ex. M)

On June 18, 2010, the Department responded with a notification of cancellation. (Defs.' Facts ¶ 20) Titled "CANCEL – POLICE INFO," the cancellation stated that the incident "occurred on 5/15/2010 not 5/8/2010 as initially reported" and that "information received from male subject Ronald Christian indicates that female subject listed in message Everette Christian was not present . . . [and] that he was at jewelry store for legitimate purposes." (Cancellation

---

[6] Reverend Christian also claims that parishioners gave him copies of the Information, and that a copy was left on his car. (Pls.' Facts ¶ 36)

Information, Br., Ex. H)  The cancellation was sent to 883
Critical Reach Systems, 69 fax machines, and 865 email
addresses; the Information was originally sent to 576 Critical
Reach Systems, 42 fax numbers, and 531 email addresses.  (Pls.'
Facts ¶ 56)

Reverend Christian continues to work at the Love Baptist
Church, but claims he lost paid speaking engagements at other
churches because of the Information.  (Pls.' Facts ¶¶ 40-41)  He
sought medical treatment for his stress and anxiety but was not
placed on any medications and was told that he is "medically
fine."  (Pls.' Response Facts ¶ 21; Defs.' Facts ¶ 21)  Everette
felt too embarrassed to attend subsequent church events and no
longer considers herself a member.  (Pls.' Facts ¶ 39)  Everette
has not sought the treatment of a medical professional.  (Defs.'
Facts ¶ 22)


## II.

Summary judgment is proper if "the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986).  In deciding a motion for summary judgment, the Court
must construe the facts and inferences in a light most favorable

to the non-moving party.  Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" Conoshenti v. Public Serv. Elec. & Gas, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting Celotex, 477 U.S. at 323).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 249.

### III.

Plaintiffs allege Defendants McConnell, the Department, and the Borough of Red Bank ("Borough") are liable under (A) 42 U.S.C. § 1983; (B) 42 U.S.C. § 1985; (C) 42 U.S.C. § 1981; (D) various New Jersey common law torts; and (E) New Jersey's Law Against Discrimination.[7]  (Compl. ¶¶ 32-66)  For the reasons set

---

[7] Plaintiffs also name several ficticious entities that have not yet been dismissed.  Although "[u]se of John Doe defendants is

forth below, the Court will grant summary judgment in Defendants' favor on each of Plaintiffs' claims.

## A. § 1983

"By the plain terms of § 1983, two–and only two–allegations are required in order to state a cause of action under the statute.  First, the plaintiff must allege that some person has deprived him of a federal right.  Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law."  Gomez v. Toledo, 446 U.S. 635, 640 (1980).

The parties do not dispute that Captain McConnell acted under state law.  Accordingly, Plaintiffs' § 1983 claims turn on whether Plaintiffs were deprived of a federal right.

The Court has identified three federal rights Plaintiffs allege were infringed.  The Plaintiffs allege explicitly that Defendants' actions "deprived [them] of their constitutional rights to due process of law [and] equal protection of the

---

permissible in certain situations until reasonable discovery permits the true defendants to be identified," these parties must be dismissed if such discovery does not reveal their proper identities. See Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir.2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery); see also Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").  Accordingly, the fictitious entities and organizations listed as Defendants are dismissed.

law[.]" (Compl. ¶ 33)  In addition, the Court construes Plaintiffs' allegations that Defendants' violated their privacy rights to constitute a claim for constitutional invasion of privacy. (See Compl. ¶ 33)

Plaintiffs' claims, however, fail for the following reasons.

### 1.   Due Process

Plaintiffs' § 1983 claim predicated on a deprivation of procedural due process rights fails because Plaintiffs do not identify an entitlement, with which Defendants interfered, deserving of due process protection.

The Fourteenth Amendment decrees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  "To prevail on a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide due process of law."[8]  Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 194 (3d Cir. 2009).

---

[8] To the extent Plaintiffs allege a violation of their substantive due process rights, such rights are "violated by

When evaluating such a claim, courts "first must determine whether the asserted interest is encompassed within the Fourteenth Amendment's protection of life, liberty, or property[.]" <u>Solomon v. Phila. Hous. Auth.</u>, 143 F. App'x. 447, 452 (3d Cir. 2005).

Plaintiffs allege the following interests deserve due process protection: (a) Reverend Christian's lost speaking engagements at other churches, and (b) Reverend Christian and Everette's damaged reputation within the community.

Procedural due process, however, does not protect every benefit; rather, to have a property interest in a benefit, a person must have more than a unilateral expectation of receiving the benefit. <u>Town of Castle Rock, Colo. v. Gonzales</u>, 545 U.S. 748, 756 (2005). In constitutional parlance, the claimant must have a legitimate claim of an "entitlement." <u>Culinary Service of Delaware Valley, Inc. v. Borough of Yardley, Pa</u>, 385 F. App'x. 135, 141 (3d Cir. 2010). Furthermore, a "plaintiff must

---

executive action only when [the action] can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 (1998). "[O]nly the most egregious official conduct" shocks the conscience. <u>Lewis</u>, 523 U.S. at 846. "Whether an incident 'shocks the conscience' is a matter of law for the courts to decide." <u>Benn v. Universal Health Sys., Inc.</u>, 371 F.3d 165, 174 (3d Cir. 2004) (citing <u>Rochin v. California</u>, 342 U.S. 165, 172, (1952)). Defendants' conduct does not come close to shocking the conscience, and consequently, any claim under substantive due process fails.

14

demonstrate entitlement to a property interest created expressly by state statute or regulation or arising from government policy or a mutually explicit understanding between a government employer and an employee." Carter v. City of Philadelphia, 989 F.2d 117, 120 (3d Cir. 1993).

Reverend Christian's speaking engagements, however, allegedly lost due to Defendants' dissemination of the incriminating Information, were not created by state statute or regulation, did not arise from a government policy, and did not originate from a mutually explicit understanding between the Reverend and a government employer.  Accordingly, Reverend Christian's prospective speaking engagements are not property interests afforded due process protection.

Furthermore, while the Fourteenth Amendment secures for Reverend Christian the liberty right to hold private employment and to follow a chosen profession free from unreasonable government interference, see Piecknick v. Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994), the record indicates Defendants have not interfered with this right: Reverend Christian continues to work for Love Baptist Church.  (Christian Dep. at 43 ("My job is to preach, pray, visit the sick[.]")) ; cf. Culinary Service of Delaware Valley, Inc., v. Borough of Yardley, 385 F. App'x. 135, 141-42 (3d Cir. 2010) (dismissing § 1983 claim because defendant-borough's interference with game manufacturer's

15

ability to sell one specific arcade game did not prevent manufacturer from selling other such games); Bernard v. United Twp. High Sch. Dist. No. 30, 5 F.3d 1090, 1092-93 (7th Cir. 1993) (finding no liberty interest in distributing one particular print because plaintiff was not prevented from distributing other prints); Piecknick, 36 F.3d at 1259 ("It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.").

Accordingly, Reverend Christian has failed to put forward a cognizable claim based on interference with a property or liberty interest predicated on his lost speaking engagements.

Plaintiffs also allege due process violations based on the reputational harm suffered by both Reverend and Everette Christian.  In § 1983 parlance, such claims are known as "stigma-plus" claims because claimants must "show a stigma to [one's] reputation plus deprivation of some additional right or interest."  Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006).  In other words, reputation damage is not actionable unless "it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution."  Clark v. Twp. of Falls, 890 F.2d 611, 619 (3d Cir. 1989).

16

As noted above, the Reverend's lost speaking engagements are not protected under the Fourteenth Amendment, and Plaintiffs do not point to any other interest with which Defendants interfered.[9]  Consequently, even if Plaintiffs were able to prove government action that unlawfully stigmatized them, see Ersek v. Twp. Of Springfield, 102 F.3d 79, 83-84 (3d Cir. 1997) ("the government action first must involve a publication that is substantially and materially false"), Plaintiffs' § 1983 "stigma-plus" claim cannot succeed.[10]

---

[9] Although the Third Circuit has not definitively answered the question "whether something less than a property interest, independently protected by the Due Process Clause, could be a sufficient 'plus,'" Ersek v. Twp. Of Springfield, 102 F.3d 79, 83 n.5 (3d Cir. 1997), the Supreme Court "has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." Paul v. Davis, 424 U.S. 693, 706 (1976).

[10] Because the Court holds that Plaintiffs have not asserted an individual interest encompassed within the Fourteenth Amendment's protection, it does not analyze whether "the procedures available to [Plaintiffs] provide[d] due process of law." Hill, 455 F.3d at 234; see also Ersek, 102 F.3d at 84 ("The principal relief to which an individual is entitled should the government's stigmatizing comments rise to the level of a due process violation is a hearing to clear [one's] name."). The Court notes, however, that upon learning of the Information, Reverend Christian faxed Captain McDunna of the Department a letter informing him that (i) Everette Christian had been misidentified and was not present at Hamilton; and (ii) he and his wife visited Hamilton for legitimate purposes. (Pls.' Facts ¶ 37)  Captain McDunna soon thereafter adopted Reverend Christian's corrections in the follow-up "Cancel - Information" that was sent to even more recipients than the original Information. (Defs.' Facts ¶ 20; Pls.' Facts ¶ 52)

## 2.   Equal Protection

To succeed on their § 1983 equal protection claim, Plaintiffs must prove that Defendants' actions (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.  See Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-66 (1977); Major Tours, Inc. v. Colorel, 799 F. Supp. 2d 376, 391 (D.N.J. 2011).  To prove discriminatory effect, Plaintiffs must show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that they were treated differently from members of the unprotected class.  See Major Tours, Inc., 799 F. Supp. 2d at 392-93.

Plaintiffs allege that white customers at Hamilton were not followed throughout the store, but Reverend and Tami Christian were.[11]  Plaintiffs do not, however, offer any evidence whatsoever by which the Court could conclude that Defendants—as opposed to the employees of Hamilton—treated them differently than white citizens.  See Warner v. Federal Express Corp., 174 F. Supp. 2d 215, 223 (D.N.J. 2001) (granting defendants' motion for summary judgment because of "no proof of discrimination in

---

[11] (Pls.' Facts ¶ 6 ("Although plaintiffs never asked for his assistance, Hillebrandt escorted plaintiffs upstairs because it was the policy of Hamilton that all clientele be escorted due to the 'valuables' located upstairs.  However, Camera 16, frame 1, shows a white male go upstairs to the second floor unattended."))

the record besides whatever inference is drawn from the fact
that Plaintiff was a member of a protected class"). 
Accordingly, Plaintiffs' claim cannot succeed.

### 3.   Right to Privacy

Plaintiffs allege Defendants "invad[ed] plaintiffs' right
to privacy" and "depriv[ed] plaintiffs of their rights,
privileges, and/or immunities secured by the United States
Constitution and law." (Compl. ¶ 33)  The Court construes
Plaintiffs' allegations as a § 1983 "right to privacy claim,"
and will grant summary judgment in favor of Defendants.[12] See
Warner v. Township of South Harrison, 885 F. Supp. 2d 725, 736
(D.N.J. 2012) (setting forth the elements to a § 1983 right to
privacy claim).

Although the Constitution does not expressly protect a
right to privacy, and the Supreme Court has not found such a
generalized right, the Court has recognized "zones of privacy"

---

[12] The parties did not brief the strength of Plaintiffs'
substantive claim, choosing instead to focus their attention on
the applicability of qualified immunity. (See Br. at 11-20;
Opp'n Br. at 19-32)  This was in error.  The Supreme Court has
repeatedly instructed lower courts and litigants that that the
first issue to be analyzed in § 1983 matters is whether a
deprivation has occurred at all.  See, e.g., Cnty. of Sacramento
v. Lewis, 523 U.S. 833, 841 n.5 (1998).  Qualified immunity
should only be considered if the Court first finds that a
constitutional right has in fact been violated.

in the various amendments to the Constitution. <u>Roe v. Wade</u>, 410
U.S. 113, 152-53 (1973); <u>C.N. v. Ridgewood Bd. of Educ.</u>, 430
F.3d 159, 178 (3d Cir. 2005).  These zones protect two types of
privacy interests, only one of which is relevant here: the right
to avoid disclosure of personal matters.[13]  <u>Hedges v. Musco</u>, 204
F.3d 109, 121 (3d Cir. 2000).

To evaluate such a claim, the Court must first determine
whether the information disclosed is entitled any privacy
protection.  <u>C.N.</u>, 430 F.3d at 179.  If a privacy interest is
implicated, the Court must then weigh the various competing
interests at issue and decide whether the disclosure was
justified.  <u>Id.</u> at 179-80.

The Court holds that even if Plaintiffs' privacy interests
were implicated in the publication of the Information,
Defendants' publication of the details contained therein was
justified.  <u>See</u> <u>Paul P. v. Verniero</u>, 170 F.3d 396, 404 (3d Cir.
1999) (affirming summary judgment in defendants' favor on
constitutional privacy claim after recognizing a privacy

---

[13] The other privacy interest protected by the Constitution is
possessing the independence necessary to make certain kinds of
important decisions, such as those relating to marriage,
procreation, contraception, family relationships, and child
rearing and education.  <u>United States v. Westinghouse Elec.
Corp.</u>, 638 F.2d 570, 577 (3d Cir. 1980).

interest in one's home address and subsequently engaging in balancing inquiry).

The Third Circuit has held specifically that police reports, such as the McConnell report from which the details of the Information were taken, are public documents that, if disseminated, do not implicate constitutional concerns.

In Scheetz v. The Morning Call, Inc., 946 F.2d 202, 207 (3d Cir. 1991), the Third Circuit held that "the information contained in a police report is not protected by the confidentiality branch of the constitutional right of privacy." And the court has more recently reaffirmed this rule. See Nunez v. Pachman, 578 F.3d 228, 232 (3d Cir. 2009) ("Here, Nunez does not dispute the established precept [that] . . . police reports . . . are inherently public-not private-documents and are thus beyond the purview of the Due Process Clause.")

Consequently, McConnell's dissemination of the Information was justified, even if Plaintiffs' privacy interests were implicated in its publication.  Accordingly, summary judgment will be granted in favor of Defendants on Plaintiffs § 1983 claims.[14]

_____

[14] In connection with their § 1983 claims, Plaintiffs allege municipal liability against Defendant Borough.  (Compl. ¶ 62) However, in the absence of an underlying constitutional violation, there can be no municipal liability under § 1983. See Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482-83 (3d Cir. 2003) ("[F]or there to be

## B. § 1985

Plaintiffs allege Defendants are liable under 42 U.S.C. § 1985(3), and in response Defendants move for summary judgment.[15]

"Section 1985(3) permits an action to be brought by one injured by a conspiracy formed for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." Estate of Oliva v. N.J. Dep't of Law & Pub. Safety, Div. of State Police, 604 F.3d 788, 802 (3d Cir. 2010). To prevail, a claimant must establish: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) a person has been either injured in his person or property or deprived of any right or privilege of a citizen of the United States. United Broth. of Carpenters and

---

municipal liability, there still must be a violation of the plaintiff's constitutional rights."). Accordingly, summary judgment is granted in Defendants' favor on Plaintiffs' claim for municipal liability.

[15] Title 42 Section 1985 provides, in relevant part:
    If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . the person so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 829 (1983); Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006).

A "meeting of the minds" is required for a civil rights conspiracy cause of action. Starzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008). Yet there is no evidence in the record from which one could infer an understanding or agreement to conspire against Plaintiffs. The evidence only indicates that McConnell met with Hillibrandt to follow-up on Officer Hicks' initial report, that McConnell pursued his investigation independent of Hillibrandt, interviewing Anthony and running background checks on Reverend and Everett, and that he disseminated the Information to inform nearby law enforcement agents of the recent report. Accordingly, Plaintiffs' claim cannot succeed.

### C. § 1981

Plaintiffs allege Defendants are liable under 42 U.S.C. § 1981 for "committing acts of defamation against them."[16]  (Compl.

---

[16] 42 U.S.C. § 1981 states:
    All persons within the jurisdiction of the United States
    shall have the same right in every State and Territory
    to make and enforce contracts, to sue, be parties, give
    evidence, and to the full and equal benefit of all laws
    and proceedings for the security of persons and property
    as is enjoyed by white citizens, and shall be subject to

¶ 65)  Plaintiffs, however, do not defend this claim in their opposition brief.  (See Opp'n Br.)  Consequently, the claim is waived.  Freeman v. Middle Tp. Bd. of Educ., Civ. No. 10-6024, 2012 WL 3715925, at *3 (D.N.J. Aug. 27, 2012) (granting summary judgment in defendants' favor on all claims not defended in plaintiff's opposition brief); see also Resolution Trust Corp. v. Dunamr Corp., 43 F.3d 587, 599 (11th Cir.1995) ("In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. . . . [T]he onus is upon the parties to formulate arguments; grounds alleged in the compliant but not relied upon in summary judgment are deemed abandoned.").  Summary judgment will be granted in Defendants' favor.[17]

### D. State Law Tort Claims

Defendants move for summary judgment in their favor on all of Plaintiffs' state law tort claims on the basis of the

---

like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

[17] The Court further notes that § 1981 does not provide claimants with a private right of action against state actors.  McGovern v. City of Philadelphia, 554 F.3d 114, 121 (3d Cir. 2009).  Rather, litigants seeking to enforce rights guaranteed by the § 1981 must do so under § 1983.  See, e.g., Benjamin v. City of Atlantic City, Civ. No. 12-3471 (NJS/AMD), 2014 WL 884569, at *9 (D.N.J. Mar. 6, 2014).

statutory immunity afforded by New Jersey's Tort Claims Act.[18]
N.J.S.A. 59:3-3 provides: "A public employee is not liable if he
acts in good faith in the execution or enforcement of any law."

"Good faith immunity under section 3-3 has two alternate
components." Alston v. City of Camden, 168 N.J. 170, 186 (2001)
(internal quotations omitted).  A public employee must
demonstrate either "'objective reasonableness' or that he
behaved with 'subjective good faith.'" Id.

"[I]mmunity would be defeated if an official knew or
reasonably should have known that the action he took within his
sphere of official responsibility would violate the
constitutional rights of the plaintiff, or if he took the action
with the malicious intention to cause a deprivation of
constitutional rights or other injury." Id. at 187 (quoting
Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982).

The Court finds Defendants' conduct objectively reasonable.
Captain McConnell began investigating the Hamilton incident
because of two separate incident reports, each initially called
into the Department by different proprietors whose stores are
located on the same street.  A separate officer, Officer Hicks,
responded to the calls and noted that the reports may be

---

[18] Specifically, Plaintiffs allege (i) defamation (Compl. ¶¶ 39-
46); (ii) right to privacy (id. ¶¶ 47-49); (iii) intentional
infliction of emotional distress (id. ¶¶ 50-53); and (iv)
negligence (id. ¶¶ 54-58).

related.  McConnell then interviewed Hillebrandt and Anthony,
each of whom confirmed, in varying degrees of certainty,
Reverend Christian and Everette's presence at Hamilton.
McConnell subsequently reviewed Hamilton's video footage and
discovered Reverend Christian's prior shoplifting complaint.

   Such conduct, when combined with the strong protection
afforded the dissemination of police reports, justifies holding
that McConnell's conduct was reasonable.


### E. New Jersey Law Against Discrimination

   Plaintiffs allege that Defendants "subjected the Plaintiffs
to differential treatment on the basis of race . . . thereby
violating the New Jersey Law Against Discrimination."  (Compl. ¶
60)

   The New Jersey Law Against Discrimination, codified at N.J.
Stat. Ann. § 10:5-1 et seq., prohibits unlawful discrimination
in employment, housing, places of public accommodation, and
certain business transactions.[19]

---

[19] Although Plaintiffs allege Defendants violated New Jersey's
Law Against Discrimination in their Complaint, they cite the New
Jersey Civil Rights Act (NJCRA) in their opposition brief.  (See
Opp'n Br. at 19).  While Plaintiffs are of course bound by what
they allege in their Complaint, the Court notes that under the
instant facts, the analysis for both claims are the same.
Compare Baklayan v. Ortiz, Civ. No. 11-3943, 2012 WL 3560384, at
*4 (D.N.J. Aug. 15, 2012) ("To state an equal protection claim
under the NJLAD, a plaintiff must present facts alleging that
the individual Defendant's conduct had a discriminatory effect

New Jersey case law has established that a municipal police department and its officers may be considered a "place of public accommodation" in the context of a LAD claim.  Borroughs v. City of Newark, Civ. No. 11-1685, 2013 WL 4047588, at *12 (D.N.J. Aug. 9, 2013); Ptaszynski v. Uwaneme, 37 N.J. Super. 333, 353 (App. Div. 2004).

For a claimant to succeed on a LAD claim based on race discrimination perpetrated by the government in a non-employment setting, he must present facts establishing the state action had a discriminatory effect and was motivated by a discriminatory purpose.  Anderson v. Cnty. of Salem, Civ. No. 09-4718 (RMB/KMW), 2010 WL 3081070, at *12 (D.N.J. Aug. 5, 2010). However, as noted above, see supra III.A.2., Plaintiffs have failed to establish Defendants' conduct had a discriminatory effect.

Accordingly, summary judgment will be granted in favor of Defendants on Plaintiffs' Law Against Discrimination claim.

---

and that the conduct was motivated by a discriminatory animus.") with Major Tours, Inc. v. Colorel, 799 F. Supp. 2d. 376, 391 (D.N.J. 2011) (" To prevail on their . . . NJCRA equal protection claim[], [p]laintiffs must each prove that actions of each [d]efendant (1) had a discriminatory effect on them and (2) were motivated by a discriminatory purpose.")

**IV.**

For the reasons stated above, Defendants' motion for summary judgment will be granted.  An appropriate order accompanies this opinion.


Date: April __17____, 2014


                                 __/s/ Joseph E. Irenas_____

                                 Hon. Joseph E. Irenas
                                 Senior United States District Judge